This is Pistorius v. Alpena Vision Resources. We have for the appellant, Gerald Stocks, and for the appellee, Daryl Parrish, this is 4090727. Please proceed. May it please the Court, Mr. Parrish. Our appeal addresses two issues, dealing with a Murdoch site and a Harristown site. I'll deal with the Murdoch site if it pleases the Court first. The Murdoch site is a reclamation site, a land dump, where Alpena was under contract with Pistorius to manage that site. Alpena owed money to Pistorius for not As we moved into the calendar year 2008, they were attempting to work out arrangements for the payment. Pistorius was anxious, wanting to be paid, threatening that they would leave the site. We get to the end of February of that year, and the road closes at the That cuts the income stream off, and the roads ultimately had to be repaired. Pistorius secured judgment for the Pasadu payments. A forfeiture wasn't affected, but they received judgment for that. Alpena complains that the contractual duty of Pistorius, while they arrive and dump. I thought there was some problem with flocculants? There were biosolids with flocculants in it that were piled along portions of the access road, and they'd been present and had developed, not immediately, but had been present for many, many months, roughly the time when the months. A condition fairly known to all, that there were biosolids containing the flocculants in them. The road, nonetheless, was maintained as accessible for all of those months, and the duty to keep the roads open was the Pistorius' duty to manage whatever was out there at the site to keep the site accessible to March 1, the road no longer was accessible. The trial court, in its ruling below, placed specific emphasis on a February 25 email where Alpena, through their evidence that rebutted the claim that they were failing to keep the road open, the road was still open. Loads were still coming in. Income stream still was present. So to attribute some form of notice or to impeach the factual assertions of Alpena that the road was not accessible at that time so as to defeat our claim, would not have a basis in evidence. The road was still open at that time. Loads were still coming in. Now we were in dispute over payment. March 1, they're not keeping the roads open. And from March 1 until they pulled from the site on March 17, they weren't keeping the roads open. And the consequences of that time frame, not having the roads open, we were unable to get loads into our site for five weeks. The testimony that it was their duty to keep the roads accessible, that's the testimony of Mr. Pistorius himself. The evidence that the site was closed for five weeks is unrebutted evidence in the record. The testimony that the gross revenue from those five weeks based on was unrebutted. So in terms of our damage, if Pistorius is held accountable, $31,000 was the lost net profit from that disruption of our services by their failure to keep the roads open. Is it a breach of duty if the road was closed because of heavy rainfall? In managing the site, it is their duty to manage the elements with which they are facing, be it the weather, be it the loads that others are bringing in, if it's fly ash one day, bed ash the next day, or these They had free reign as to where they put any of these. The fact that we knew biosolids were at or near one of the access roads, fine. But they could always move it. They were the ones in charge, they being Pistorius, in charge of keeping it open. participated in the decision about where to put these biosolids and gave advice about, well, maybe you could shore up the road using some fly ash or whatever. And Pistorius isn't the person who said, yeah, let's take in all the sludge. I'm thinking in terms of, could the trial court have viewed it, that you chose to accept the product? Because the manager, I mean, Pistorius knows from what? About as much as you guys did about the biosolids. Well, I don't know that we have a record that would establish that. Well, Harp says he didn't have any experience in doing that. So that's one of the byproducts that you take in. And then your people are there and discuss where to place it. At least that's some of the evidence. The trial court could have concluded that. It ends up being piled on both sides of the roads. Maybe nobody is aware of what will happen with the flocculant. And then you have a central Illinois spring or late winter, which there's a lot of moisture. Now, you could take a different view of that. But is it permissible for the trial court to have concluded that, how could you blame Pistorius for this? Which apparently is what he did. I would agree that's what the trial court did. But I believe that that misapprehends what the obligation of Pistorius was. He is engaged to deal with these issues because these issues are expected, are contemplated, they are what comes to a landfill site such as this. He is hired to, that is the array of risks that he knows coming in and he is to deal with it. Otherwise, we've just hired a bulldozer driver and it's more than that. He's to manage the site. But he wasn't paid from what, August of 2007 and this is March of 2008? I believe the last service he was paid for, it was in the late summer, I wanted to say September, but it was in that time frame. This is true. It's that there were $48,000 I believe, $41,000 of delayed payments. That is true and they received judgment for that. And we're not taking appeal from that. But they maintained on the site. They continued to execute their obligations on site. They continued to bill for services they said they were performing on site. Now, did they continue to perform those services because of past due payments? Well, they didn't leave the site. They continued to bill for truckloads coming in on the site. Were they still doing their job, keeping the access roads open, which was what they were to do in exchange for the payment for the loads that continued to come? I would submit that the only evidence is that they were not because those roads were not accessible. But those roads did close. Well, that's the result and they're also testimony that plaintiffs did work to shore up the road and did bring in rock? Prior to closure. I mean, this was a recurrent. Actually, I would submit that that actually bolsters our position is that they always, that was continuing, that they would do things to keep that road accessible. They were bringing in rock at times well in advance of the road closure. They were managing that road well in advance. If anything, that supports our position that they were to keep these roads accessible, that they were doing that at all times. That was one of their duties on this site. They did it before. They kept it open under similar conditions. They get upset they're not getting paid and they're staying on site. They charge because a truck dumps, not because they've actually provided a service. So trucks are still dumping and they're still charging. But something's not getting done to keep the access roads open. And it got away from them and trucks no longer could come through. There was then $7,500 of restorative work that had to be performed and the lost income. I believe it distills a very simple question is, is the duty of Pistorius under these facts to have kept that access road open? And in light of all of the excuses they may want to assign, they were hired to engage and encounter those excuses and keep that road open. And they were in control of it. And the mere fact that we may have had notice as to where they piled biosolids, they were always free and at liberty to move them as was necessary to keep that access road open. And that is where we submit to the trial court. I spend a lot of time in the trial court. I don't call it notice when you've got guys there talking and they say, yeah, let's put some over here, let's put some over here. That's not notice to your company. That is your agents, whether you call it control or you call it participate or you call it collaborate. That's different than notice. Well, one, it's not an employee of Alpena that was ever there. I mean, our agent for managing this site is Pistorius. Well, who are Powell and Hart? Powell is a salesman that goes out and helps develop a business to bring to the site, but he's an independent contractor. Hart was an engineer that would review the site generally to determine whether we had environmental permit issues and assess it from an engineering perspective. The management of the site in terms of keeping the roads open and moving the materials on site, that's why we hired Pistorius. He was the person that we independently contracted with to take care of those issues. So I guess I submit that the roles of Hart and Powell did not displace or did not substitute or did not excuse Pistorius from doing what they were hired to do. With reference to the Harristown site, Harristown, a property that Alpena had purchased... In the 2008 correspondence between CONZAC to Pete and Tim Pistorius, the court comments that CONZAC made no mention of any problems associated with Pistorius' management of the site, including road maintenance issues. Were the road maintenance issues in existence in February? The road still was open. Well, were there road issues? There could have been road issues. This probably would not have developed overnight, but I have an absentee manager that is in Michigan. As long as the road is open, it's not an issue. The trucks are coming through and dumping. As long as the road is open, steps can be taken to preserve its accessibility. So in a land dump, there's always water, there's always piles. It's a fluid setting. The critical element is that our loads were still coming in, our revenue stream was uninterrupted, so there was no issue as we would define road issue, meaning accessibility. On the Harristown site, is there double recovery? It is really the question for services that Pistorius had offered. It's a long, convoluted history as to how things started at Harristown, how the original contemplated objectives of both parties had been frustrated once the IEPA said, this is not an appropriate staging facility for this line coming from the Gator Water Treatment Plant. The parties originally had contemplated staging line there, then officiating it, which is a word I learned in the trial. I don't know that it's a real word, but to ready it for resale to farmers or for self-use as a soil neutralizer. And they had planned to originally contemplate it. They would sell that at some agreed rates, defendant's exhibit 3 being the primary memo of that, $12 a dry ton, and then divide the profits from that. Of course, when the IEPA said remove the material from the site, different things ensued. The original contract upon which Pistorius sued Alpena and received judgment had two components to it. A dollar a dry ton for accepting the dump. They performed that. They got judgment for that. And in fact, they effectively had been paid for that. They had owed us cash rent for the farm surrounding it. They were holding that in abeyance as a credit for that particular element of their claim. So we got respective judgments on that, and it essentially washes the first element of their contract for Harristown. The second element they received judgment for was the job they were to have done in managing the lime piles to beneficiate it for this contemplated resale. Those services never had to be performed as contemplated because the IEPA said stop this, get this material off site. What Pistorius did perform were services to remove it from site and ended up allocating it to farmland that Pistorius itself either owned or leased in its farming operations from third parties. They received judgment at the $1.25 per dry ton rate for the management which they did not perform in the context of the original agreement. We don't appeal that because from our perspective they were entitled to some compensation for having removed the lime, and we have viewed that being a form of management of the lime pile. That is the way they managed it. But not only have they been paid for the services they provided, they've been allowed to retain the value of the lime on their farmland or on the land they have leased without compensation. Was there value to that lime? Yes, and I believe there's no fact question that there was value to that lime. There was a pretrial stipulation that it has value as a soil neutralizer. It is worth $3 per ton coming directly from a quarry. Our problem with this lime is that it took more to apply it to the property to put it on the farm than the lime that would come from the quarry. Its value from the quarry would have been $40,500, $13,500, $3 from the quarry. It cost them $17,800 to apply it because it may have been more of a slurry. The enrichment realized to Pistorius is still, real quick with the math, but that's about $22,697 of actual enrichment benefit they enjoyed without compensation. Even if we say that because this stuff was wetter than the dry lime coming from the quarry, even if we accept that, the expense and give them credit for the expense to put it on the ground, they've still been enriched. Our contemplated agreement would have been much more money than we would have expected for this lime, which would have been $3 to $6 per dry ton. Things gone as originally anticipated, that would be the maximum value, which would be $81,000. Those are the two ranges in our claim. If you can get $3 dry from the quarry, why in the world would the maximum of this $6 plus amount, how does that even factor in? It depends which branch we're in. If what, the court found that there was no express contract. Well, just forgetting the contract. The guy over here says I'll sell it to you for $3, and the guy over here says I'll sell it to you for $6. Who are you going to buy from? Well, then you're in the implied contract analysis where you have to look at the value of the enrichment to Pistorius. I mean, I'm not going to buy the $3 lime. Forget this case. I'm saying when you come into court and say we expected that this could have gotten $6. We could have gotten $6 for this. Doesn't that, to me, that is a credibility issue. The lime market, you might be $20 a ton. It's wildly fluctuating. And so it would be at time of trial or testimony is $3 from a quarry. But the value of lime being placed on farmland is, we don't have evidence of the record, but it is wildly fluctuating. And then you have time, distance, transportation costs, where it would be used. I mean, a lot of factors can go into pricing. So how much, under your theory, were they enriched? Not less than $22,697. Thank you. Thank you. Thank you, counsel. Mr. Parrish. Thank you. I fully support it. Mr. Stocks. My brief that I wrote is very short because I think Judge Bollinger wrote my brief for me. I haven't seen, in 35 years of practice, I haven't seen very many decisions from a trial court that involve this much energy and effort. And I think Judge Bollinger did a really good job of analyzing just about every issue that was put before him. And I think he came to the right decision. As this court knows from its decision in the People-X-Rail-Madigan v. Petco Petroleum case a few or four years ago, this just restates what everybody knows is that a trial court is entitled to great deference in a case like this where it saw the evidence and not just heard the words but saw the witnesses testify and had a chance to evaluate their credibility. In order to reverse this decision, you would have to determine that the decision below has some fairly evident, plain, and indisputable error. And I don't believe there's any such error in this case. I don't believe there's any error in this case, but nothing rises to the level of plain or indisputable. So why wasn't your client enriched to the tune of $22,000? It's because this material isn't really – I mean, they speculated about selling it for $6 a ton, and Mr. Stocks talked about wildly speculating, wildly fluctuating values. The evidence in this case was that you can replace this with real limestone, which comes from a quarry, for $3 a ton. And in our brief, we spelled out that they spent $17,000 to spread this material, but that's in addition to their own efforts. They had to load it. They had to load it at a cost of a couple of dollars a ton, and they had to haul it to the field at another $3 to $5 a ton. And that's wet ton, so we're talking about – they've spent $4.50 to $7 per wet ton to get it from this pile out to their fields. And if we're talking on a dry ton basis, that's $9 to $14 a ton. Because this material, it came into the quarry – they all expected it to be kind of dry. It sat up in piles. When it came in, it was much wetter than expected. It was more like grits, as Mr. Konchak said, and it couldn't be spread with an ordinary fertilizer spreader like farmers have available to them. When they buy lime, it's usually spread, and there's a machine that's in the texture of sand. It's pretty easy to handle. This stuff required a special thing like a big manure spreader, and that was expensive. They actually had to spend $17,000 to this contractor to bring a spreader in to spread it, and they had to incur an additional expense of $9 to $14 a dry ton to get it to the field where the spreader was. Did it have the desired effect? I assume it did. We don't know what the analysis of it was. It wasn't ever measured for what is the cation exchange capacity, which is how you rate limestone. Nobody knows what that was. It was just some material that was in a pit at the water treatment plant in Decatur, and it was hauled out and put in a pile. One might infer, though, that in addition to being helpful to the dependent, that Pistorius thought, I may gain some benefit from using this on my own land. Yeah, I think that's an inference. The suggestion in the reply brief is that they should have hauled it to Murdoch to put it in a hole if they didn't think it was worth anything. Well, I suggest that taking it another 50 miles instead of the few miles that would involve preparing it for the fields would have been even more expensive to get rid of it and would have filled the hole up at Murdoch, which the parties, the whole reason to think this up at Harristown was so they could do something and get it out on farmland as opposed to putting it in a hole where it would be buried. You're not disputing that the lime had value, are you? No, no, it had value. We admitted that it had value. It has value, but how much the value is, nobody knows. There was no evidence of what it was really worth, what the analysis of it is. I analogize this to you. Well, it seems like to me if you spent over $17,000, and apparently it was way more than that, because it also had loading, it must have had value in excess of that. Otherwise, why spend the money? Well, because they've got to get rid of it. The EPA says you've got to move this pile. An alpina is not going to pay for anything until the pile is out of there. That was one of the conditions to getting paid was to get the EPA's action. It had to go. It had to go someplace. It couldn't stay there. What are you going to do with it? Are you going to haul it to Murdoch 50 miles and spend a bunch of money, or can we get it out on the fields? That's what they did. How about a different farm? A third party's farm? It went on to farms that, well, historians had permission to put it on farms that they own and also farms that they don't own, that they rent from others. And on the farms where you typically would put it on somebody else's farm, you would typically charge the owner for that. They didn't charge anybody for this, because they didn't think it was worth charging for. They did not. They put it on at no cost to the owners of the farms where they apply it. They own some. Other individuals own some. Historians have read of those farms. Okay, I'm not quite following that. So they put it on farms that they own and that they rent. Yeah, but they were associated with all the land where the lime was spread. That's true. Well, my question is, why wasn't it spread on a different farm that historians was not associated with? I can't answer that. Well, whose decision was to spread it on? Well, I assume it was historians' decision to get rid of it. The decision was to get rid of it. I think they all agreed that it's got to go, and I don't know who said, let's put it on Tim Pistorius' farm or another farm that they rent. I don't know how that decision was made. That's not in the record, and I don't know to this day how that decision was made. I don't know that Alpena didn't participate in the decision to put it on the Pistorius farms. I do know that Alpena never claimed any payment for any of this lime until after, this is months and months later, and after they're still talking about, well, we've been remiss in paying you. We understand that. We've hit a brick wall or hit a wall on our cash flow. And it's not until after Pistorius finally leaves and quits that shortly after that they get this huge bill for this limestone. And I think the judge could have decided it on that basis alone. Well, they didn't think it was worth much when they were talking about not paying. If they thought it was worth something, they should have said something much earlier in the process. I think the lime basically is an afterthought. At some point way after we're done with Pistorius, we don't have to worry about working with them in the future. Let's send them a bill for some limestone. I think that's what happened. So did the judge find laches in the claim? He does refer to that. He does refer to that. He thinks it's very telling that at some point in the decision, the judge says it's very telling that they didn't mention that until later, that they're talking about the cash flow as the reason why they haven't paid. They never mentioned, we're not paying you for the work you've done because you owe us anything on limestone. That never happened during any of the correspondence between them, and Judge Goldinger did refer to that. I believe it's on page 8 or 9 of his decision. I think it's on C81, but I'm not sure. They're still talking about promising for payment. On page 8 of the court's decision on C81 of the record, and that's in the appellate's brief, they're still talking about payment, no mention of any payment for limestone, until after I sent the letter saying you owe us this money, then they get a bill about the same time for the limestone. So the trial court decided they waited too long to ask for payment for the lime? No, I don't think he said they were waiting too long. He said they must not have thought it was important, must not have thought there was a claim. They didn't think much of their own claim, or they would have mentioned it earlier. But they didn't think the claim had any value either. They were happy to get rid of the limestone, and the plaintiff didn't assign any value to that limestone either until way after the fact. Well, would it be correct that he first found that there wasn't any agreement to pay for it to start with? Yeah, exactly. There was no agreement to pay for it. And I don't want to speculate about what would happen if somebody said, well, you can take this, but you have to pay us for it. I imagine it would still be in the pot. That's my guess. But the Pistoriuses had to do something with it. The EPA put them under the press, under the gun, to get the stuff out of there. So it had to go someplace. And one theory that was advanced in the reply brief was they should have taken it to Murdoch. That wasn't advanced in the trial. That was never suggested. And I think that everybody was just happy to get rid of it. It's one of these things that one man's trash is another man's treasure. What was thought to be treasure turned out to be trash, the second location too, and it had to be gotten rid of. Now as to the Murdoch site, I would simply say that in the complaint, the allegations of how they breached the contract were, number one, they didn't level the materials, and number two, they placed this material beside the road. That's the only two allegations of a breach of contract in the counterclaim. And the testimony is they did level all the materials. The Pistorius said, yes, we did level all the materials. And as to how the material was placed beside the road, they had a meeting and by consensus they decided, first of all, they were going to stockpile this stuff, no doubt. It was going to be stockpiled and then when the pit got full of this ash, inorganic material, they were going to cover up the ash with about four feet of this sludge and hopefully start some vegetation growing on it. So they were going to stockpile that. And by consensus of all the folks out there, that is Tim Powell and Mr. Hart and Tim Pistorius, they all agreed, well, let's put it by the road. And it's not true that Pistorius had the exclusive control over where to put that. These three people, at least three, were all, in some sense, representatives. Pistorius' were working for Alpena, but so was Powell and so was Hart. They were more of the administrative type people making decisions of this nature. By consensus, they said, let's put this along the road. So that turned out to be a problem. It's not clear that there was any other place to put it either. You say move it. So when Mr. Stock says that Powell was an independent contractor and not associated with his client and neither was Hart, that's just incorrect? You always have this issue. Is this person who looks like an employee to the public? I think that's the problem. He probably was getting paid $10.99 instead of a W-2, but I think he was regularly retained to do work. And actually he was doing it through his own corporation. His corporation was consulting with Alpena. But he was basically there. He was doing work that you would typically see employees doing in other situations. As I said, the only breach of contract alleged in the complaint is failing to level the piles, which the evidence is that was done, and placing material by the road. And the evidence was they all, by consensus, agreed to do that. And there was no complaint about any of this until after Pistorius finally did leave. And even while they were threatening to leave, they were being invited to stay and promised that payment would be forthcoming. And the only reason why payment had not been forthcoming was not because we had these big counterclaims against you, which we haven't asserted, but it was because we don't have the money to pay you. But stick with us a little bit longer and we'll take care of it. And I suggest that Judge Bolinger saw through all of that, saw through Mr. Konchak and Mr. Harp, and rendered a very correct and proper judgment. Thank you. Thank you, counsel. Mr. Stacks, rebuttal. The line was a treasure to Pistorius. It was not trash. We're after the value of that. Keep in mind, the transportation, the removal, all of those services, we paid for. We got sued on another count of the complaint that we do not take appeal from, the second element of the original contract, and we've paid them for that. Otherwise, they were paid for something they provided no service, because that line was never managed on site. It was never dried out on site, never ready for sale on site. So they're getting a double dip. They're wanting to say, this had no value because of all these things we had to do, so we're taking the line in kind, if you will. Well, they sued us to get paid cash on the contract. They got judgment and they got paid for that. So that's a double dip right there. They were paid specifically for what? Removing it? The initial contract was broken into two components. When the line came in from the third-party source and you were paid $1 a ton, they performed those duties. They actually had some extra charges to provide or to build, and this is in the record as well, where they had to move some dirt, and they were paid separately for that. So it was coming in and it was getting dumped. They were paid. The plan was that once it was there, you would beneficiate it. You would take those steps so that you could turn around and resell it because this was not a permanent site. This was a staging site. That was contemplated from the beginning because they had no permits for this site. It goes back to the advice they had received from the Illinois Department of Agriculture that we could temporarily stage if it was going to go and be placed in an agricultural use. They never had to provide or perform any of those services for the back half of the contract, the $1.25 a dry ton. So they sue us for that, saying that their acts of having to remove it and everything they did to get it off-site was the management. So now they're getting paid $1.25 and keeping the line as payment in kind. As Tim Pistorius said, until they paid me, I was going to hang on to it to hope to enforce the payment. That was his testimony. So we've got in-kind payment by enjoyment of the line, cash payment by their enforcement of the contract. Even if we were buying line from the quarry, that's $3 a ton from the quarry. You still have the expense of transportation, delivery, and spreading it. So these are not unique expenses that are wet slurry. The only unique expense to our wet slurry because we had not beneficiated it yet, which means they hadn't performed their management duties, was the $17,800 for the manure spreader type distribution of the product. Whereas if we measure damages just from their enrichment, it is plausible to reduce their $40,500 value by what they expended with this particular product, put it on their land, and enjoy benefit. A substantial expenditure, and they admitted that it had value as a soil neutralizer. On the Murdoch site, the February 25 email was a Murdoch invoice communication. It was not a Harristown communication. We're discussing mixing apples and oranges here to use one communication and say it had applicability to what was taking place in the other site. So any credibility questions or whether we thought it was a good claim or not isn't even manifest in that February 2008 email where they're talking about the delayed payments. Apples and oranges there. Our claims weren't barred. Shortly after the February 25 promises to pay, our road is closed. The relationship is exploding. We're owed money on cash rents that hadn't been paid in three years, and the parties were in their corners. What's your response to the argument that the trial court essentially said, well, you didn't think there was any value to the lime until such time as the lawsuit? We have admissions by Mr. Pistorius that the lime had value. It's even in the joint stipulation. So any finding that it had no value is contrary to the stipulations and admissions of the parties. The timing that we recognize or appreciate value, it doesn't mean that we were walking away from any claim. We know that we owed on Murdoch, but we weren't making any agreements with respect. There was still money due and owing the second half of the management agreement. We were always in dispute with regard to Harristown. We hadn't waived or expressed any abandonment of those claims at all. Thank you. Thank you.